## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2025 AUG 11  PM 2:10

**KELLY PATRICE WOODS,** )

(individually and as next of friend )
of her minor children) )

**T.W.-V.,** )
**H. W.-V.,** )
**and E.W.** )

*Plaintiffs.* )

)
)
)
)
)
)
)
)
)
)
)

**VS** )

)
**COMMONWEALTH OF MASSACHUSETTS** )
(by and through its agency, )
The Department Of Children and Families), )

)
**DEPARTMENT OF CHILDREN** )
**AND FAMILIES,** )

)
**JUDGE JENNIFER L MCNULTY,** )
First Justice of the Barnstable Juvenile Court )
(in her official capacity only) )

)
**OFFICER JOHN TIBBITS** )
(in his official capacity and individual capacity) )

)
**ORIANA GUCCIARDI, ESQ.** )
(in her official capacity and individual capacity) )

)
**C.P JR.,** )
(Next of Friend, in his individual capacity for )
factual completeness and accountability only) )

)

Civil Action No.

**VERIFIED COMPLAINT FOR
INJUNCTIVE RELIEF,
DECLARATORY JUDGMENT,
AND DAMAGES**

UNDER 42 U.S.C. §§ 1983, 1985(3), AND THE
AMERICANS WITH DISABILITIES ACT

1

<table>
<tr><td>

**JOSE M VEGA,**
(in his individual capacity)


**KEVIN BRAY,**
(in his official capacity and  individual capacity)

**JUVENILE PROBATION OFFICER DOE 1**
(official and individual capacities),

**JUVENILE PROBATION OFFICER DOE 2**
(official and individual capacities),

**GUARDIAN AD LITEM DOE 3**
(official and individual capacities),

**And other unknown individuals whose
identities will be substituted upon discovery,**

            *Defendants*
</td><td>
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
</td></tr>
</table>

## <u>VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGEMENT, AND DAMAGES</u>

(Filed Pro Se Pursuant to Supporting Claims Under *42 U.S.C. § 1983, § 1985*, and the ADA)

## 1. Preface:

This civil rights complaint arises from a series of retaliatory, unconstitutional, and procedurally defective actions by state actors in Massachusetts, including judicial officers, the Department of Children and Families (DCF), law enforcement, and court-appointed personnel. At the heart of this case is a cascading failure of due process and disability rights protections that has left my family—especially my disabled daughter—exposed to irreparable harm. The state's mischaracterization of facts, reliance on improperly accessed or undisclosed evidence, and retaliatory judicial overreach culminated in an unlawful *su sponte* removal of my children, which remains in place as of this filing.

This case         —***Woods v. Commonwealth***—        notably the longest 72-hour custody hearing following the *su sponte* removal of my children by the judge *–not DCF–*, draws a firm line against the continued use of a contaminated criminal narrative to justify civil removals, suppress

disability accommodations, and shield officials from accountability. After the initial misrepresentation by DCF regarding failure to follow its own policies, directly misled the court and initiated this chain of violations. Instead of correcting the record, the First Justice escalated harm under color of law. The misuse of my pending criminal matter as a backdoor rationale for undermining my parental rights is both unconstitutional and dangerous. This complaint is filed *pro se* because no one else—not DCF, not the Court, not appointed counsel—has acted to stop this.

This is where ***Woods v. Commonwealth*** draws the line. At every step of this process—*across both executive and judicial branches*—those in power have compounded their own procedural failures by placing the burden of correction on me, the accused, the mother, and the only person trying to do what is right.

Instead of owning the original misrepresentations or clarifying the record, the Commonwealth doubled down—relying on unconstitutional escalation, retaliatory prosecution, and the weaponization of my unrelated criminal allegations to preserve a narrative that never belonged to the facts.

The inclusion of my criminal charges into juvenile court deliberations was not incidental—it was strategic. It was used not to protect my children, but to deflect attention away from how badly both the Department and the Court had mishandled the case from the start. That decision—*by Judge McNulty and others*—**crossed a constitutional threshold that this Court can no longer ignore.**

It is not justice when a court refuses to correct its own reliance on falsehoods. It is not due process when a mother is treated as inherently guilty for demanding accountability. And it is not American when a family is kept fractured simply to preserve the credibility of those who made the mistake.

What began as an internal departmental failure has become a constitutional crisis. The judiciary does not get to shield itself behind DCF's missteps, nor does DCF get to pretend the damage was inevitable. It wasn't. It was chosen.

**And if this case means anything, it is that no child's stability—*and no parent's rights*—should ever be collateral damage for the convenience of the Commonwealth.**

I am now the only party with standing and urgency to seek federal protection. I do so not only on behalf of my family, but to challenge a dangerous systemic loophole being exploited against parents across this country: the fusion of unverified criminal allegations with civil custody determinations, without factual or procedural integrity.

3

This action is brought under the Constitution of the United States and the laws enforcing it, including but not limited to 42 *U.S.C. § 1983*, to remedy ongoing violations of the Fourteenth Amendment, the Americans with Disabilities Act, and related federal protections against unlawful seizure, denial of due process, and retaliatory state conduct.

The Plaintiff brings this case to enjoin further constitutional harm resulting from an orchestrated pattern of procedural misconduct, evidentiary contamination, and civil-to-criminal crossover tactics that have weaponized Massachusetts family and juvenile courts to bypass the safeguards of a fair trial. The state has permitted false and defamatory testimony—driven by family adversaries, improper law enforcement conduct, and judicial overreach—to contaminate the record in both civil and criminal proceedings.

**This case presents a matter of urgent federal concern. Without immediate injunctive relief, the Plaintiff and her minor children will suffer further irreparable harm, including potential removal, deprivation of liberty interests, and ongoing violations of disability rights.**

**Plaintiff respectfully seeks intervention by this Court to preserve constitutional integrity, to halt retaliatory misuse of state power, and to ensure that civil forums are not abused as pretextual vehicles for criminal punishment without due process.**

## 2. INTRODUCTION:

(With Supporting Claims Under *42 U.S.C. §§ 1983, 1985(3)*, and the Americans with Disabilities Act)

This is a verified civil rights action brought by Plaintiff Kelly Woods, in her individual capacity and as next friend and temporary physical custodian of her minor daughters Taegan Woods-Vega, Haydn Woods-Vega, and Elle Woods, pursuant to a conditional placement by the Massachusetts Department of Children and Families (DCF). This action seeks injunctive and declaratory relief under *42 U.S.C. §§ 1983 and 1985(3)*, and *Title II* of the Americans with Disabilities Act (ADA), to redress egregious and ongoing violations of Plaintiffs' constitutional and statutory rights.

These violations were perpetrated by state actors—including Judge Jennifer L. McNulty of the Barnstable Juvenile Court, DCF officials, law enforcement officers, probation staff, and appointed legal representatives—under color of state law and with deliberate indifference to Plaintiffs' rights to due process, equal protection, familial association, and access to services guaranteed under federal disability law.

Plaintiffs have suffered continuing and irreparable harm, including the unlawful removal of minor children, retaliatory prosecution based on false or conflated allegations, and repeated interference with disability accommodations and family stability. These harms are not

speculative. They are active, measurable, and compounding—impacting each family member differently but rooted in a common pattern of judicial overreach, agency misconduct, and state-enabled retaliation.

At the center of this dispute lies the deliberate mischaracterization and conflation of two distinct firearm-related incidents, which were used as a pretext to justify court-ordered removal, deny due process, and suppress Plaintiff's legal and parental defenses. The resulting trauma fractured the family unit and disrupted the rights of each child named herein. The youngest child, Elle Woods, who is nonverbal and autistic, suffered disproportionately due to the state's refusal to accommodate her disability and the court's failure to uphold ADA-mandated protections.

Through this action, Plaintiffs seek to (1) enjoin ongoing unlawful conduct, (2) compel correction of the public record, and (3) restore constitutionally protected rights before further injury occurs.

**STANDING UNDER *RULE 17(c)*:**

Pursuant to Federal Rule of Civil Procedure *17(c)(2)*, Plaintiff Kelly Patrice Woods brings this action in her individual capacity and as next friend to her minor children—C.H.R.I.S.T.O.P.H.E.R. Prerost Jr., T.A.E.G.A.N. Woods-Vega, H.A.Y.D.N. Woods-Vega, and E.L.L.E. Woods—each of whom is under the age of 18 and lacks legal capacity to sue on their own behalf. Although Plaintiff does not presently hold legal custody, she retains a close parental relationship and has been entrusted with temporary care and custody under the supervision of the Massachusetts Department of Children and Families (DCF). Plaintiff is a fit and proper person to represent her children's interests, is not adverse to them in any pending matter, and asserts claims arising from the constitutional and statutory violations that directly harmed them.

### 3. JURISDICTION AND VENUE:

    A. This Court has subject matter jurisdiction over this action pursuant to *28 U.S.C. §§ 1331* (federal question), *1343(a)(3)* and *(4)* (civil rights jurisdiction), and *42 U.S.C. §§ 1983, 1985(3)*, and *12132*.

    B. This Court is authorized to issue declaratory and injunctive relief pursuant to *28 U.S.C. §§ 2201* and *2202* and *Rules 57* and *65* of the Federal Rules of Civil Procedure.

    C. Venue is proper in the District of Massachusetts pursuant to *28 U.S.C. § 1391(b)* because all events giving rise to this action occurred within this judicial district, and all Defendants reside in or conduct official business within Barnstable County or the Commonwealth of Massachusetts.

## TABLE OF CONTENTS:

1. **Preface**
2. **Introduction**
3. **Jurisdiction and Venue**
4. **Parties**
5. **Factual Evidence:**
   - I.    Timeline of Events
   - II.   Civil Wrongs: Factual Allegations
   - III.  ADA Violations and Placement Failure
   - IV.   DCF Internal Accountability Failures and Institutional Harm
   - V.    Judicial Misconduct and Procedural Subversion of Criminal Due Process
   - VI.   Firearm Safety and Child Endangerment Allegations
   - VII.  Firearm Narrative as Pretext for Retaliation and Procedural Misconduct
   - VIII. Misrepresentation and Conflation of Separate Firearm Incidents
   - IX.   Due Process and Misleading Evidence

**6. Legal Claims:**
   Count I – Violation of the Fourteenth Amendment (Procedural and Substantive Due Process)

   Count II – Retaliation for Protected Activity:

   Count III: Violation of the Americans with Disabilities Act (ADA)

   Count IV: Retaliation for Protected Activity (First Amendment)

   Count V: Unlawful Search and Seizure (Fourth Amendment)

   Count VI: Judicial Misconduct and Abuse of Authority

   Count VII: Conspiracy to Interfere with Civil Rights (*42 U.S.C. § 1985(2) and (3)*)

**7. Relief Requested:**

   **1.** Declaratory Relief

   **2.** Injunctive Relief

   3. Woods v. Commonwealth

4. Removal and Disqualification of RSO John Tibbetts

5. Monetary Damages

6. Policy-Based Remedies and Advocacy

7. Records Correction and Retraction

8. Attorney's Fees and Costs

9. Equitable Relief

10. Request for Federal Criminal Review and Prosecution

11. 11. Any Other and Further Relief

12. Proposed Policy Reform Requests

8. **Closing Affirmation and Verification**


## PARTIES:

1. **Plaintiff Kelly Woods** is an individual residing in Barnstable County, Massachusetts. She brings this action in her individual capacity, and as the mother of the minor children referenced herein, with temporary physical custody pursuant to the Department of Children and Families' conditional placement, pending judicial review. She is the primary caregiver for her nonverbal autistic daughter and has been the central parental figure in all children's lives.
2. **Co-Plaintiff Taegan Woods-Vega**, a minor, is Kelly Woods' biological daughter. She appears through her mother and next friend, Plaintiff Kelly Woods, who has standing to advocate on her behalf under federal civil rights and disability law.
3. **Co-Plaintiff Haydn Woods-Vega**, a minor, is Kelly Woods' biological daughter. She appears through her mother and next friend, Plaintiff Kelly Woods.
4. **Co-Plaintiff Elle Woods**, a minor, is Kelly Woods' biological daughter. Elle is a child with a qualifying disability under the Americans with Disabilities Act. She appears through her mother and next friend, Plaintiff Kelly Woods.
5.

Pursuant to Federal Rule of Civil Procedure *17(c)(2)*, Plaintiff Kelly Patrice Woods brings this action in her individual capacity and as next friend to her minor children—T.A.E.G.A.N. Woods-Vega, H.A.Y.D.N. Woods-Vega, and E.L.L.E. Woods—each of whom is under the age of 18 and lacks legal capacity to sue on their own behalf. Although Plaintiff does not presently hold legal custody, she retains a close parental relationship and has been entrusted with temporary care and custody under the supervision of the Massachusetts Department of Children and Families (DCF). Plaintiff is a fit and proper person to represent her children's interests, is not adverse to them in any pending matter, and asserts claims arising from the constitutional and statutory violations that directly harmed them.

6. **Interested Party Christopher Prerost Sr.** is the biological father of Minor Defendant Christopher Prerost Jr. He is not named as a defendant but is a relevant actor whose history and conduct inform the events alleged herein.

7. **Interested Party David Chase** is the long-term partner of Plaintiff Kelly Woods and the proposed de facto parent of Co-Plaintiff Elle Woods. He is listed as a non-party witness with standing interest in the outcome of these proceedings due to his consistent caregiving role and first-hand knowledge of relevant events.

Plaintiff respectfully identifies the following parties to this action, all of whom are sued under *42 U.S.C. § 1983* and/or applicable federal law.

8. **Defendant Jennifer L. McNulty** is the First Justice of Barnstable County Juvenile Court. She is sued in her official capacity for acts taken under color of law that resulted in constitutional deprivations and unlawful removal orders entered sua sponte.

9. **Defendant Massachusetts Department of Children and Families (DCF)** is the state child protection agency responsible for custody decisions and family interventions. It is sued for its policies, practices, and actions that led to unconstitutional removals and ADA violations.

10. **Defendant Officer John Tibbetts** is a law enforcement officer with the Dennis Police Department. He is sued in his individual and official capacities for actions taken under color of law that resulted in unlawful search, seizure, and misinformation used in court proceedings.

11. **Defendant Jose Vega** is the biological father of Plaintiff's three minor daughters and a central actor in the underlying custody conflict. Despite a documented history of estrangement and allegations of abuse, Defendant Vega has been permitted to inject himself into active proceedings through coordination with other defendants. He is sued in his individual capacity for coordinated efforts to undermine Plaintiff's parental rights through misrepresentation, manipulation of judicial and agency processes, and retaliatory custodial claims.

12. **Defendant Kevin Bray** Department of Children and Families–approved foster placement provider who was assigned custody of Plaintiff's minor child during the events at issue.

He is sued in his individual capacity for acts taken under color of state law that contributed to the denial of accommodations, the filing of retaliatory reports, and participation in unlawful state action.

13. **Defendant Oriana Gucciardi Esq.** is the appointed attorney for Plaintiff's minor son, Christopher Prerost Jr., in associated juvenile proceedings. She is sued in her individual capacity for her role in promoting inflammatory, misleading, and retaliatory narratives under color of state law, including scripting and advancing testimony used to justify unlawful removals and criminal escalation against the Plaintiff.

14. **Defendant Guardian ad Litem (GAL) for Christopher Prerost Jr. Jane Doe 3:** is included as a party for acting jointly with state actors to advance harmful and retaliatory allegations against Plaintiff.

15. **Minor Defendant Christopher Prerost Jr.** is the 17-year-old biological son of Plaintiff. He is named as a minor defendant solely in relation to acts that have directly harmed Plaintiff and his siblings, and that have served as the factual basis for state actors' unconstitutional interference.

16. **Defendant Juvenile Probation Officer Jane Doe 1,** Massachusetts Juvenile Probation Officer, presently unidentified actor employed by the Barnstable Juvenile Court who participated in or materially contributed to the retaliatory escalation, including misreporting events in official records, fabricating or omitting critical facts during judicial proceedings, and issuing or influencing the issuance of removal and investigative orders.

17. **Defendant Juvenile Probation Officer Jane Doe 2,** Massachusetts Juvenile Probation Officer, presently unidentified actor employed by the Barnstable Juvenile Court who participated in or materially contributed to the retaliatory escalation, including misreporting events in official records, fabricating or omitting critical facts during judicial proceedings, and issuing or influencing the issuance of removal and investigative orders.

These Defendants are sued in their individual capacities for conduct that violated Plaintiff's constitutional and statutory rights under color of state law.

# FACTUAL EVIDENCE:

## I. TIMELINE OF EVENTS:

1. **May 5, 2025** – Plaintiff's son, Christopher Prerost Jr., is arrested on assault charges following a domestic incident against Plaintiff.

2. **May 6, 2025** – Christopher Jr. is formally charged. This marks the last time Plaintiff sees him for over a week.

3. **May 14, 2025** – Plaintiff files a Child Requiring Assistance (CRA) petition in Barnstable Juvenile Court in response to escalating behavioral concerns regarding Christopher Jr., consistent with her obligations as a parent.

4. **May 15, 2025** – Plaintiff appears in person before Judge Jennifer L. McNulty for the initial CRA hearing regarding her son. While Plaintiff is standing in court, Barnstable police enter her residence without a warrant, using a false welfare check as a pretext to observe the interior of her home and report alleged firearm-related evidence. The intrusion is captured on home surveillance, including telephone audio (of RSO John Tibbits) suggesting "plain view" justifications despite the absence of any exigency. These observations become the basis for a search warrant obtained the next day.

5. **May 15, 2025** (later that day) – Plaintiff voluntarily surrenders to RSO John Tibbits after her court appearance. No warrant or formal charges are served at that time.

6. **May 16, 2025** – A search warrant is executed at Plaintiff's home by Dennis police, including RSO John Tibbits, numerous personal items are seized. Plaintiff's young autistic child—*Elle Woods*—was exposed to trauma and distress during the execution. Restrained in her highchair for three hours, caregivers promptly arrived but were refused to allow Elle to be removed from the residence, even when a bomb dog came inside and everyone else was removed for "procedure".

 *Plaintiff later learns that the warrant was premised on the unlawful entry that occurred the day before.*

7. **June 3, 2025** – Christopher Jr.'s Harassment Prevention Order (HPO) petition is denied. However, at this hearing he references Plaintiff's supposed criminal charges— as does foster Father, Kevin Bray. Weeks before Plaintiff was ever notified of any such charges—suggesting prior unauthorized access to sealed or privileged information. Christopher Jr. contacts Jose Vega and informs him of Plaintiff's criminal charges, insisting "sisters must be saved".

8. **June 18, 2025** – During a follow-up CRA hearing before Judge McNulty, Plaintiff hears for the first time that criminal charges are being prepared against her. One of the court staff publicly states that she is expected to be arraigned soon in criminal court. Plaintiff has not yet received any formal charging documents, Judge McNulty read charges from the warrant affidavit at that hearing.

9. **June 20, 2025** – Plaintiff receives her first criminal summons by mail. This confirms that her son—and others—were aware of criminal charges weeks in advance, before Plaintiff had any legal notice.

10. **July 7, 2025** – Plaintiff speaks with Jose Vega, the biological father of her three daughters. She informs him about the criminal charges she is now facing and explains the

backstory involving Christopher Jr. Mr. Vega expresses support and offers no objection to Plaintiff continuing to care for their daughters.

11. **July 10, 2025** – Plaintiff is arraigned on her criminal charges. That same day, she informs Vega of the home surveillance footage proving that police entered her home unlawfully on May 15, 2025. This information is shared in good faith, to reassure him that their daughters were never in danger.

12. **July 15, 2025** – Vega abruptly shifts his stance after discovering that their daughter Elle's legal name is "Elle Woods" and not "Elle Woods-Vega." Although the name had been mutually agreed upon at birth—and Vega's signature appears on the birth certificate—he reacts with volatility. He accuses Plaintiff of altering official records, despite never having contested the name in the past. Plaintiff suspects defendant Vega did not read what he signed in the hospital since birth, her and minor children have never corrected him in fear of retaliation. Plaintiff asks Mr. Vega where he got that information from, he said Christopher Jr. Vega threatens to expose the illegal police entry she disclosed to him in confidence despite the threat to Plaintiff and daughters, vows to "do anything" to get Plaintiff back. He ultimately uses this knowledge as leverage in what appears to be a coordinated custody strategy in concert with Christopher Jr.

13. **July 20, 2025** – Plaintiff and her three daughters attend a scheduled family physical. During this visit, Plaintiff's daughter Taegan Woods-Vega places a phone call to her brother, Christopher Prerost Jr. Plaintiff enters mid-conversation and hears Christopher threaten Taegan directly: "If I don't get my stuff back, I'll keep this going." He then says, "She fucked up. It's something she said in the beginning, and we're going to use it against her." Plaintiff identifies this as a retaliatory and premeditated statement, corroborating the coordinated nature of the misconduct.

14. **July 20, 2025** – On the same day, Plaintiff attempts to request a copy of Christopher Jr.'s medical records from the pediatric office for the purpose of complying with a SNAP/EBT verification request. The office denies access, despite Plaintiff still retaining legal custody at that time. This marks the first time Plaintiff's parental rights are functionally obstructed without notice or legal justification. The pediatricians office says to clarify with DCF for a record request. Plaintiff's attorney Phil DeYoung contacts Christine Frauton to address the unlawful denial of parental access to medical records.

15. **July 21, 2025** – Upon inquiry, DCF confirms that Plaintiff does, in fact, retain legal custody of Christopher Jr. at this time. The obstruction appears to have been retaliatory and procedurally improper, further evidencing the systemic misconduct that began escalating in July. The plaintiff was able to complete the record request at this time in the Pediatrics office.

16. **July 24, 2025** – Judge Jennifer L. McNulty issues a sua sponte removal order stripping Plaintiff of custody of four children, including three daughters without a request or supporting affidavit from DCF. The removal order is abrupt, unsupported by evidence of imminent harm, and fails to accommodate the ADA needs of Elle Woods, Plaintiff's

nonverbal autistic daughter. This marks the first actual legal deprivation of custody over Plaintiff's minor children and is at the heart of this federal complaint.

17. **July 24–29, 2025** – Elle is placed in an ill-equipped foster setting that fails to accommodate her sensory, communicative, and therapeutic needs. The placement collapses within days. Simultaneously, Taegan and Haydn Woods-Vega report being taken to a party in the care of foster providers where alcohol was present and adult males were unknown to the children. This placement constitutes a severe breach of foster care protocols, triggering emotional trauma and safety concerns for both girls.

18. **July 28–29, 2025** – The ongoing 72-hour hearing begins, ostensibly to review the emergency removal ordered by Judge McNulty. However, instead of restoring custody, the court allowed continued removal of the children through **Tuesday, July 29,** thereby extending the girls' traumatic foster stay for nearly a full week with no judicial finding of neglect or abuse. The hearing remains unresolved into August.

19. **July 31, 2025** – Despite the return of the children, which did not conclude the 72-hour custody hearing, which remained open and ongoing, the courtroom atmosphere that week shifted dramatically. What should have been a de-escalation instead turned into a coordinated campaign of character assassination that intensified with each hearing day.

20. Throughout the proceedings, it became increasingly clear that multiple courtroom actors were constructing a strategic and retaliatory narrative to justify earlier judicial misconduct and anticipate potential federal exposure.

21. **August 1, 2025** – Set for hearing again, Tuesday, August 5, 2025 and all assertions below;

## II. Civil Wrongs: Factual Allegations:

1. I lawfully waived my right to trial in this juvenile matter, but the presiding judge refused to honor that waiver, forcing the proceeding forward - citing her "judicial gut" as lawful reason to proceed forward.

2. As a result, my voice was silenced while my son Christopher Jr.'s untested, inflammatory, and defamatory accusations were legitimized in court.

3. The court's refusal elevated emotionally charged testimony over verified evidence, strategically staging civil proceedings as a proxy for criminal adjudication.

4. This reversal of legal standards—using civil testimony to influence criminal prosecution—bypasses the required due process of criminal law.

5. My criminal case has been prejudiced by hearsay, discretionary orders, and agency filings entered into the juvenile record without evidentiary foundation.

6. My son's use of legal terminology like *"unregistered firearm"* indicates direct coaching by someone versed in Massachusetts criminal law.

7. These terms do not align with Illinois or Indiana law, where we previously resided, and where Christopher never had legal access to or knowledge of firearms.

8. His testimony suggests that privileged information from my criminal case—such as discovery or investigative details—was leaked or improperly shared.

9. I formally assert that this constitutes a breach of the evidentiary chain of custody, directly undermining the integrity of both proceedings.

10. The court proceeded in my absence, despite multiple waivers of appearance, allowing hostile petitioners like Christopher Prerost Jr. and Kevin Bray to dominate the record.

11. Jose Vega weaponized private information I shared in good faith about the illegal May 15, 2025 search to smear me once I refused to change Elle's last name.

12. This retaliation, in partnership with Christopher Jr., initiated a campaign to strip me of my parental rights and advance a criminal narrative.

13. Key bodycam evidence from May 15, 2025 and May 16, 2025, was referenced in juvenile court before it had been reviewed by my criminal defense counsel.

14. The use of this footage—*or knowledge of its contents*—in juvenile court strongly suggests cross-divisional leaks or unlawful disclosures.

15. This represents a breakdown of constitutional procedure, reversing the standard flow of due process and undermining my ability to defend myself.

16. My son's statements mirror prosecutorial framing and terminology, indicating likely coordination with legal advocates or officers.

17. The record has been contaminated through coordinated bias, hearsay, and privileged access, triggering a cascade of defamatory filings.

18. On May 16, 2025, Officer John Tibbetts did not mention sex toys during the warrant execution, nor was it included in any application or footage counsel or I have reviewed.

19. This detail appeared later in the business record, suggesting a false and sexualized narrative was seeded post hoc for prejudicial impact.

20. On August 1, 2025, a probation officer falsely testified about the cleanliness of my home and even fabricated the existence of a cat I do not own.

21. Her visit was recorded via home security footage and contradicts observations by DCF workers, therapists, and the court-appointed fact checker.

22. She triggered a retaliatory 51A report, putting my daughters at risk of removal again—despite no corroborating concern from any other agency.

23. Most egregiously, she falsely claimed Elle, my nonverbal autistic daughter, "had been playing with a sex toy"—what was actually colorful plastic LEGO flower pieces.

24. The item was visible on camera and clarified in real time during her visit; it was standard children's play material.

25. This claim weaponized Elle's disability in service of a fabricated, sexualized accusation, compounding the false narrative seeded by Officer Tibbetts.

26. These actions reflect a coordinated effort between law enforcement and court agents to bias the record through false, humiliating, and inflammatory statements.

27. This fabricated narrative is not grounded in fact or evidence but in retaliation, bias, and procedural abuse under color of law.
28. If allowed to continue, this coordinated smear campaign will unlawfully taint my criminal trial, resulting in a wrongful conviction.
29. This constitutes a textbook violation of due process under the Fourteenth Amendment and supports claims of prosecutorial misconduct and judicial overreach.

## III. ADA Violations and Placement Failure:

1. On July 24, 2025, the court issued a *su sponte* order removing my daughters, including Elle Woods—a nonverbal autistic child—from my care, without first implementing or reviewing appropriate disability accommodations.
2. This removal was not requested by the Department of Children and Families (DCF), which had previously supported a safety plan to keep the girls in my care.
3. The court failed to consider Elle's Individualized Education Plan (IEP), sensory sensitivities, communication challenges, and the extensive support systems in place in our home that allowed her to thrive.
4. The foster placement selected for Elle was not equipped to handle her specific disabilities. No autism-specialized training, therapeutic integration, or environmental modifications were provided.
5. Elle's foster placement quickly failed—she exhibited signs of extreme distress, regression, and shutdown behavior. This failure was foreseeable and preventable had the court consulted any of Elle's care providers.
6. Despite multiple attempts to alert the court and DCF to the inadequacy of the placement, my concerns were ignored, and no accommodations were offered to prevent or remedy the harm caused to Elle.
7. At no point did the court seek input from Elle's established service providers or specialists who had long supported her educational and therapeutic needs in my home.
8. The removal and placement failure constitute a direct violation of the Americans with Disabilities Act (ADA), which mandates individualized accommodations before any state action that could substantially alter the life of a disabled child.
9. The court's unilateral decision denied Elle her right to equal access to education, services, and safety under the ADA and Section 504 of the Rehabilitation Act.

10. I was never offered a disability-based family team meeting (FTM) or any other accommodation-based review before the placement order was executed.

11. The ADA violations were compounded by the fact that no one from the court or DCF communicated clearly about Elle's sensory plan, communication aids, or support routines—despite these being documented and accessible.

12. As a result of the failed placement, Elle suffered unnecessary trauma, regression, and emotional harm—while I was left without any opportunity to advocate for her needs through appropriate ADA channels.

13. This pattern of removal without accommodation is not only unlawful, it reflects systemic discrimination against disabled children and the caregivers who protect them.

14. By failing to uphold Elle's rights under federal disability law, the court and state actors placed her in demonstrable danger and denied her access to equal services guaranteed by law.

15. This is a textbook case of constructive removal based on disability, not neglect, and represents an urgent ADA enforcement concern.


## IV. DCF Internal Accountability Failures and Institutional Harm:

1. I assert that had the Department of Children and Families (DCF) held its agents and supervisors to the policies and statutory duties assigned to them, this case would not have escalated to its current state of constitutional crisis.

2. The assigned caseworker, Christine Frauton, was initially responsible for my son Christopher Prerost Jr.'s case and was later assigned to mine too. In both roles, she failed to perform essential duties—including timely assessments, protective interventions, and accurate documentation—thereby causing cumulative and irreparable harm to our family structure.

3. DCF has failed to implement or honor reasonable accommodations under the Americans with Disabilities Act (ADA), specifically related to the care of my nonverbal autistic daughter, Elle Woods, who was removed from our home without proper disability planning or transition support. This failure to accommodate especially during the su sponte removal by the court, Elle's unique medical and developmental needs, constitutes a violation of federal disability law and exacerbates the trauma experienced by my child, particularly in regards to placement.

4. These failures were not isolated to the frontline level. Nate Dennison, a supervisor, failed to identify and correct Ms. Frauton's missteps. When matters escalated further, Edward Kuhn, a higher-level administrator, also failed to ensure compliance with DCF policy or to initiate any meaningful oversight.

5. The lack of intervention at each supervisory level—despite visible policy violations and multiple opportunities for correction—reflects a systemic failure of accountability within the Department. This allowed personal bias, retaliatory logic, and disregard for parental rights to drive agency decision-making.

6. Notably, the presiding judge acknowledged in open court that DCF was not in compliance with its own internal policies—yet the Department did not respond with transparency, correction, or protective measures for my family.

7. Instead, DCF's institutional response appeared more focused on shielding its personnel from scrutiny than upholding legal standards or the welfare of the children. This posture contributed to the unlawful removal of my children, the erosion of due process, and the weaponization of child welfare mechanisms to support a retaliatory narrative.

8. I further assert that this pattern—of protecting internal actors at the expense of legal duty—led directly to the constitutional violations now before this federal court. DCF's failure to course-correct at multiple administrative levels demonstrates that the harm caused was not incidental, but systemic.

9. The repeated failure of DCF to protect the integrity of the process—coupled with their silence in the face of judicial misconduct—has created an environment where fabricated evidence, procedural manipulation, and retaliatory state action were allowed to flourish unchecked.

10. When a state agency abandons its legal responsibilities in favor of institutional self-protection, it ceases to function as a guardian of children and becomes a violator of civil rights. That is the posture DCF has taken in my case, and it is why this matter now belongs in federal court.

## V. Judicial Misconduct and Procedural Subversion of Criminal Due Process:

1. I assert that had the presiding judges in this matter—particularly those overseeing the juvenile and criminal branches—respected the constitutional boundaries of their respective roles, this case would not have spiraled into the procedural and constitutional collapse now requiring federal intervention.

2. The court's refusal to honor my lawful waiver of trial appearance and my repeated efforts to assert protections with representation directly enabled a civil courtroom to become the pretextual forum for my criminal prosecution—without affording me the protections guaranteed under the Sixth and Fourteenth Amendments.

3. Instead of halting the proceedings upon clear notice of waiver and a pending criminal matter, the judge forced forward a narrative built almost entirely on uncrossed testimony, hearsay, and emotionally charged accusations—particularly those of my son, Christopher Prerost Jr., who had not been vetted or examined under criminal evidentiary standards.

4. The juvenile court was improperly used as a staging ground for allegations that should have been—and still must be—subject to criminal due process. Yet that standard was

never applied. Instead, the record became a repository for prejudicial and inadmissible material, later used to support legal action against me in criminal court.

5. These actions reflect a fundamental inversion of constitutional order, in which unproven and untested civil accusations are being retroactively weaponized as criminal predicates—despite the absence of cross-examination, discovery protections, or confrontation rights.

6. The appearance of leaked or improperly accessed evidence, including May 15, 2025 and May 16, 2025 bodycam footage not yet reviewed by my criminal defense counsel but referenced in juvenile court narrative-building, further underscores the extent to which judicial oversight collapsed. No lawful evidentiary channel existed to justify such crossover.

7. I further assert that the judicial posture in this case abandoned impartiality in favor of investigatory action—operating beyond the judge's role as neutral arbiter, and instead as a silent partner to prosecutors and hostile witnesses. This role reversal corrupted the foundational premise of due process and rendered any downstream adjudication fatally compromised.

8. Had the judges involved applied the constitutional minimums required for parallel proceedings—namely, insulating the civil and criminal records from cross-contamination and protecting my right not to testify or participate—this case would not have metastasized into an administrative ambush and constitutional entrapment.

9. Instead, I was procedurally cornered—forced to choose between defending myself in an unprotected civil venue or allowing an unrefuted record to crystalize against me. That is not justice. That is constructive criminal conviction by proxy, and it has no place in an American courtroom, forcing me to enter pro se or not being heard at all;

10. For these reasons, I assert that judicial misconduct, including the refusal to halt proceedings, the abuse of discretion, and the strategic bypassing of evidentiary safeguards, is a direct contributor to the violations now before this Court.

## VI. Firearm Safety and Child Endangerment Allegations:

I make no admissions regarding the pending criminal matter now docketed against me in the Barnstable District Court. I have been advised by counsel not to discuss the allegations in that proceeding, and I expressly assert my rights under the Fifth and Sixth Amendments to the United States Constitution, including my right to remain silent and to a fair trial by jury. However, I feel compelled to state, for the purpose of this affidavit, that the civil proceedings have repeatedly relied on and mischaracterized allegations from that pending criminal case in a manner that threatens my constitutional right to a fair trial. I respectfully object to the continued citation and prejudicial use of these unresolved allegations in any civil or juvenile matter, and I reserve all legal defenses and procedural objections related thereto.

For the record, and without waiving any rights related to the pending criminal matter, I affirm under oath that I have never mishandled a firearm, nor have I ever endangered any child—mine or otherwise—in connection with any alleged conduct in this case. All firearms legally in my possession were stored in accordance with applicable safety standards to the best of my understanding at the time, and were inaccessible to my children. I categorically deny any conduct amounting to criminal recklessness, improper storage, or endangerment. The allegations made against me in the parallel criminal case have been materially distorted and repurposed in these civil proceedings in a manner I believe is prejudicial, inflammatory, and unsupported by fact or law. I assert my right to a fair and impartial trial and object to any premature adjudication or presumption of guilt in this or any related matter.

## VII. Firearm Narrative as Pretext for Retaliation and Procedural Misconduct:

Forced to choose between defending myself in an unprotected civil venue or allowing an unrefuted record to crystalize against me. That is not justice. That is constructive criminal conviction by proxy, and it has no place in an American courtroom.

For these reasons, I assert that judicial misconduct, including the refusal to halt proceedings, the abuse of discretion, and the strategic bypassing of evidentiary safeguards, is a direct contributor to the violations now before this Court.

The firearm-related allegations introduced into the juvenile proceedings—I assert that had the presiding judge in this matter respected the constitutional boundary of her respective role, this case would not have spiraled into the procedural and constitutional collapse now requiring federal intervention.

Considering but not limited to the following points:

1. The characterization of firearms as "*unregistered*"—were legally misleading and procedurally inflammatory. The term "*unregistered*," repeatedly invoked by Christopher Jr. through clearly scripted testimony by state actors, has no legal basis in the state of Illinois, where I previously resided and possessed firearms under Illinois statutes. Illinois does not require firearm registration for lawfully owned handguns or long guns under state law.
2. The misapplication of Massachusetts terminology and law to a historically Illinois-based child who cannot legally own or register firearms, not only reflects a fundamental misunderstanding of applicable jurisdiction but also evidences a reckless disregard for my constitutional rights and the integrity of the judicial process.

3. This mischaracterization of the story told by Christopher Jr. about sister, Elle Woods, whose introduction sets the stage for progression of reckless endangerment charges, based on narrative, not evidence.

4. Hostile actor Christopher Prerost Jr. facilitated the progression of Jose Vega opportunistically, retaliatory realigning, concerns that had never been raised nor verified by either Prerost Jr. or Vega before July 15, 2025.

5. Hostile and retaliatory testimony by actors such as RSO John Tibbits contradicting his very own testimony at times should raise questions of

6. The state's reliance on emotionally charged language, combined with improper evidentiary cross-contamination between civil and criminal matters, has created an unconstitutionally prejudicial framework.

7. I assert that at no time did I mishandle, unlawfully store, or endanger my children through the presence of firearms. These allegations are factually incorrect and strategically weaponized to bolster civil claims and inflate criminal exposure.

8. If the firearm narrative continues to be cited by state actors in court and administrative settings despite the documented contradictions, lack of probative value, and jurisdictional inaccuracies, such repetition will result in ongoing and irreparable harm to both my liberty and family integrity.

9. I therefore request that federal oversight be applied to this matter immediately, and that the court grant equitable relief to correct the distorted and unconstitutional use of this narrative across multiple intersecting proceedings.


## VIII. Misrepresentation and Conflation of Separate Firearm Incidents:

Despite the fact that the two firearm-related allegations occurred on separate dates under distinct circumstances, DCF records and court filings repeatedly refer to them interchangeably, conflating them into a singular, misleading narrative. This mischaracterization was not corrected until Officer Tibbetts testified in open court, at which point the separation between the May 15, 2025 and May 16, 2025 incidents was finally acknowledged on the record.

This conflation—*whether intentional or due to negligence*—had the effect of compounding perceived risk, distorting judicial reasoning, and contributing to a misleading foundation upon which both the Department and the Court appear to have based critical decisions, including the removal of my children and the escalation of my criminal charges.

The Department's internal summaries made no meaningful distinction between the initial claim of the lawful surrender on May 15, 2025 and the separate warrant execution on May 16, 2025. As such, judicial reliance on these incomplete and factually blended reports is legally significant.

## IX. Due Process and Misleading Evidence:

See **Napue v. Illinois**, *360 U.S. 264 (1959)* (a conviction obtained through use of false evidence violates due process, even if the government did not solicit it); **United States v. Agurs,** *427 U.S. 97 (1976)* (due process is violated when material evidence is withheld or misleadingly presented); **Giglio v. United States**, *405 U.S. 150 (1972)* (nondisclosure of credibility-related facts violates due process); **Miller v. Pate,** *386 U.S. 1 (1967)* (state may not knowingly use false evidence to obtain a conviction); **Santosky v. Kramer,** *455 U.S. 745 (1982)* (the fundamental rights of parents require heightened evidentiary standards before state intervention).

**This misrepresentation substantially prejudiced my position, both in juvenile and criminal proceedings, violating the core guarantees of procedural due process and leading to unlawful judicial escalation under false pretenses.**

As of the date of this filing, I assert that the cumulative effects of:

A. false and inflammatory testimony,
B. procedural manipulation,
C. and the breakdown of evidentiary boundaries between civil and criminal forums, now threaten my fundamental right to a fair trial under both the Sixth and Fourteenth Amendments to the U.S. Constitution.

Through this case, the state of Massachusetts has allowed emotionally charged, retaliatory narratives—*originating in juvenile court and rooted in hearsay*—to supplant the standard evidentiary burden required in a criminal courtroom. This has led to an inverted structure of justice: **I am being functionally convicted without ever standing trial.**

Silenced before I spoke: My multiple requests to waive or delay civil hearings—*particularly while criminal charges remain pending*—**have been denied**. As a result, I've been placed in the untenable position of defending myself in a venue that lacks:

A. the right to remain silent,
B. the right to confront accusers,
C. The right to treat a witness as hostile or lead a witness [because he's a minor]
D. the exclusion of hearsay, and other constitutional safeguards afforded in criminal court.

1. The use of civil proceedings to shape a criminal narrative—*absent formal charges, due process, or protective orders*—has fundamentally contaminated my right to present a defense. Actors like Christopher Prerost Jr., Jose Vega, Oriana Gucciardi, GAL and Officer John Tibbetts have exploited this procedural void to entrench a criminal theory of liability within the juvenile record.

2. I reiterate that the removal of my children, denial of ADA accommodations, and refusal to honor my procedural rights represent a systemic attempt to construct a criminal conviction outside of criminal court, by using civil mechanisms as a substitute for law enforcement burden and prosecutorial standard.

3. These events have created an environment of fear, distress, and loss—for myself and my daughters. I have feared for their safety, my liberty, and our future at the hands of a government process that has strayed from its duty to protect and serve. What I have experienced is not a legal error—it is a constitutional unraveling.

4. My daughter Elle Woods, a nonverbal autistic child, was removed without accommodation, cause, or protection. My daughters Taegan and Haydn were similarly removed under judicial fiat, without DCF requesting it.

5. I, their mother, have been punished for invoking my rights, reporting abuse, and exposing contradictions in the court record. My partner David Chase, a proposed de facto parent to Elle Woods, and Christopher's biological father, Christopher Prerost Sr., have suffered reputational harm and exclusion from family decision-making as collateral damage in this process.

6. These violations are not simply technical or bureaucratic—they are existential assaults on liberty, due process, and family integrity. They undermine the promises made to every citizen under the Constitution of the United States.

7. When law enforcement colludes with abusers, when judges act as investigators, and when child welfare agencies respond to political optics instead of facts—**they endanger lives, not just rights.** And they do so under the color of law.

8. The state of Massachusetts has a duty to protect its families with integrity, not secrecy. **My family should not become the blueprint for further harm. We should serve as the warning bell that stops it.**

**Accordingly, I respectfully request:**

A. The immediate return of custody of my children, particularly Taegan Woods-Vega, Haydn Woods-Vega, and Elle Woods, on the grounds that no substantiated risk exists;

B. A formal bar to Jose Vega or his family from obtaining custody or guardianship of any of my children due to his history of abuse, prolonged absence, and retaliatory behavior;

C. A denial of any ICPC transfer to Illinois regarding my daughters;

D. Declaratory and injunctive relief to halt further use of civil proceedings as proxy tools for criminal punishment.

## 6. LEGAL CLAIMS:

All Defendants unless otherwise specified.

### Count I – Violation of the Fourteenth Amendment (Procedural and Substantive Due Process)

*42 U.S.C. § 1983*

Plaintiff alleges that Defendants, acting under color of state law, deprived her of her fundamental rights to familial association, liberty, and a fair adjudicative process, in violation of the Due Process Clause of the Fourteenth Amendment.

Defendants, including but not limited to DCF officials, law enforcement officers, and judicial actors operating in administrative or supervisory capacity, failed to provide adequate notice, impartial hearings, and truthful evidentiary support prior to initiating the removal of Plaintiff's minor children.

This deprivation occurred through the willful or negligent presentation of conflated and misleading allegations—particularly regarding two unrelated firearm incidents—resulting in state-sanctioned separation of a family without constitutionally sufficient justification.

Defendants removed Plaintiff's children and deprived her of custodial rights without lawful process, adequate notice, or opportunity to be heard, violating the 14th Amendment.

The actions of DCF, court officials, and law enforcement infringed upon Plaintiff's fundamental right to family integrity and to raise her children free from arbitrary state interference.


### Count II – Retaliation for Protected Activity:

*42 U.S.C. § 1983*

Plaintiff exercised protected rights under the First and Fourteenth Amendments by filing complaints, objecting to DCF misconduct, and asserting legal rights in both criminal and civil forums.

In response, Defendants—particularly DCF personnel, Officer Tibbetts, and affiliated court officers—retaliated by escalating removals, introducing unsupported allegations, and initiating adverse actions timed closely to Plaintiff's protected activities.

Said retaliation was designed to silence dissent, punish opposition, and create leverage in ongoing legal proceedings, constituting unlawful state reprisal.

**Count III: Violation of the Americans with Disabilities Act (ADA):**

*42 U.S.C. § 12132*

Defendants failed to accommodate Plaintiff's and her daughter's disability-related needs, and removed her child without lawful process or an ADA-compliant placement plan, in violation of Title II of the ADA.

Plaintiff is the parent of a nonverbal autistic child and has repeatedly requested disability accommodations relating to home safety plans, therapeutic supports, and service accessibility.

Defendants, including the Department of Children and Families and judicial officers in their official capacities, failed to make reasonable accommodations, then penalized Plaintiff for noncompliance with plans that failed to account for her daughter's disability-related needs.

The refusal to accommodate, paired with retaliatory removals and denial of parenting opportunities, constitutes unlawful disability-based discrimination under Title II of the ADA.

The failure to accommodate Plaintiff's daughter's disability directly harmed the child and independently violated her rights under the ADA, for which Plaintiff seeks redress on her daughter's behalf as her temporary physical custody pursuant to the Department of Children and Families' conditional placement, pending judicial review and next friend.


**Count IV: Retaliation for Protected Activity (First Amendment):**

Plaintiff was retaliated against for asserting her legal rights, reporting misconduct, and refusing to waive ADA protections. This retaliation took the form of removal orders, false filings, and strategic discrediting.

**Count V: Unlawful Search and Seizure (Fourth Amendment):**

Officer John Tibbetts and others executed a search warrant based on materially false or misleading information, resulting in an unconstitutional search and seizure of property, evidence, and children.

**Count VI: Judicial Misconduct and Abuse of Authority:**

Judge McNulty acted outside the bounds of judicial discretion, issuing *su sponte* removal orders without statutory basis and failing to ensure constitutional safeguards, thereby violating Plaintiff's civil rights.

**Count VII: Conspiracy to Interfere with Civil Rights (*42 U.S.C. § 1985(2) and (3)*):**

Upon information and belief, certain Defendants, including but not limited to Officer Tibbetts, DCF officials, and court-appointed actors, conspired to interfere with Plaintiff's rights by knowingly advancing false or exaggerated narratives regarding firearm possession, interstate conduct, and parental competency.

This conspiracy was carried out through coordinated omissions, manipulated reports, and reliance on privileged or improperly accessed information to influence judicial outcomes and deprive Plaintiff of due process and equal protection of the laws.

Defendants—*including state actors and private individuals*—engaged in a coordinated effort to interfere with Plaintiff's civil rights by fabricating claims, suppressing evidence, and advancing retaliatory legal actions.

### Count VIII – Declaratory Relief:

*28 U.S.C. §§ 2201, 2202*

An actual and justiciable controversy exists between Plaintiff and Defendants regarding the legality of their conduct, including reliance on misrepresented facts, denial of ADA accommodations, and deprivation of familial integrity without due process.

Plaintiff seeks a declaration that the acts and omissions described herein violate her constitutional and statutory rights under federal law.

### Claim IX – Injunctive Relief:

*Fed. R. Civ. P. 65*

Plaintiff faces immediate and irreparable harm from continued enforcement of unconstitutional court orders, pending criminal exposure based on conflated narratives, and ADA-based discrimination.

Monetary damages are inadequate to redress the harm posed to familial integrity and liberty interests. Plaintiff therefore seeks preliminary and permanent injunctive relief restraining Defendants from:

1. Enforcing orders or custody removals based on mischaracterized firearm allegations;
2. Initiating or advancing criminal prosecution based on speculative or retaliatory narratives;
3. Denying Plaintiff or her child reasonable accommodations under the ADA;
4. Engaging in further acts of retaliation, conspiracy, or constitutional deprivation related to the events described herein.

## 7. Relief Requested:

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against all named Defendants, jointly and severally, and grant the following relief:

## 1. Declaratory Relief:

A declaration that Defendants, acting under color of state law, violated Plaintiff's rights under the United States Constitution and federal statutes, including but not limited to:

    A. The Due Process Clause of the Fourteenth Amendment, by depriving Plaintiff of parental rights without adequate notice, hearing, or evidentiary integrity;

    B. The First Amendment, by retaliating against Plaintiff for protected speech, legal objections, and formal complaints;

    C. The Equal Protection Clause, through discriminatory enforcement of standards and inconsistent treatment in similarly situated cases;

    D. *Title II* of the Americans with Disabilities Act (*42 U.S.C. § 12132*), by failing to provide reasonable accommodations and meaningful access to services for Plaintiff and her disabled child.

## 2. Injunctive Relief:

    A. **Enjoining Defendants from** including but not limited to:

1. Taking any further action based on the conflated firearm narrative, which has been judicially clarified as involving two distinct incidents;
2. Referencing or introducing any speculative or unverified allegations of out-of-state firearm possession without lawful evidentiary basis;
3. Sustaining, initiating, or justifying custody removals based on misrepresented facts or retaliatory filings;
4. Denying Plaintiff or her minor child appropriate accommodations required under the ADA in any proceeding, placement, or safety plan;
5. Retaliating against Plaintiff for asserting federally protected rights in court or related administrative proceedings.
6. A court-ordered prohibition against future retaliatory or coercive conduct by DCF or local law enforcement based on protected activity (including petitioning the court or seeking legal counsel).
7. The denial of procedural fairness during the investigation and subsequent child welfare proceedings.
8. A request for state-level review of DCF's ongoing involvement in my case, with special attention to:
    A. Their refusal to disclose information in real-time,
    B. Their failure to notify me as a parent of key events,

     C.  Their alienating and obstructive practices in regard to my son, and

     D.  Their unjustified restriction of my access to my children and their records

9.  The denial of due process and parental rights regarding the care and access to my nonverbal autistic daughter, Elle, during the warrant served at our residence May 16, 2025.

## 3. *Woods v. Commonwealth:*

This case is not only about the harm done to me and my family—it is about the systemic failure that allowed such harm to be done, and the critical need for reform to prevent it from happening again. I assert, formally and without hesitation, that this case now stands as

### *Woods v. Commonwealth.*

Not just a personal declaration—it is a constitutional challenge, and a call for the courts to finally confront the government-sanctioned abuse that families like mine endure under the guise of child welfare, judicial discretion, and prosecutorial authority.

What happened to me and my daughter Elle was not an isolated event. It was not a mistake. It was the result of calculated judicial overreach, abetted by state actors—police officers, guardians ad litem, social workers, and a judge with a known pattern of violating family integrity and constitutional boundaries. The irreparable harm she has caused to my family—*and likely many others*—**cannot be ignored or buried.**

If this case goes uncorrected, it will become *her new standard.* **This moment must become the turning point that stops her.**

For that reason, I request the following injunctive relief and reforms be considered as part of the broader civil rights remedy.

Plaintiff respectfully requests that this Court issue appropriate preliminary and permanent injunctive relief, including but not limited to:

     A.  **A stay of any state-court proceedings** likely to result in further irreparable harm;

     B.  **Federal oversight** of any continued state involvement in the custody and placement of the minor children;

     C.  **Immediate preservation** of body cam footage and evidentiary materials critical to Plaintiff's criminal defense and civil claims;

     D.  **Protection from retaliatory criminal prosecution** or judicially coordinated actions designed to chill Plaintiff's access to relief;

E. **Immediate Enjoinment of Further Removal or Disruption of Parental Custody**
Prohibiting any further removal, disruption, or limitation of Plaintiff's parental custody rights without full due process, ADA-compliant review, and judicial oversight meeting constitutional standards;

F. **Restoration of Placement for Minor Children**
Ordering the return of Plaintiff's minor children to her physical care where legally permitted, or in the alternative, suspending all third-party custody placements pending a full evidentiary review before a neutral tribunal;

G. **Recusal and Removal of Biased Judicial Officers**
Directing the recusal of Judge Jennifer L. McNulty from all matters involving the Plaintiff and ordering that no judge previously involved in the su sponte removal be reassigned to future matters concerning Plaintiff's family;

H. **Independent Review of Judicial and Agency Misconduct**
Appointing a federal monitor or directing the U.S. Department of Justice to conduct an independent investigation into the conduct of Barnstable Juvenile Court, DCF, and affiliated state actors named herein, including misuse of ex parte orders, fabricated evidence, and ADA violations;

I. **Access and Protection for Surveillance and Evidence Preservation**
Enjoining DCF or any state actor from disabling, erasing, or interfering with Plaintiff's home surveillance recordings and requiring preservation of all relevant video and communications evidence;

J. **Protection Against Retaliatory Prosecution or Charges**
Prohibiting use of Plaintiff's protected speech, legal filings, or complaints (including this federal action) as grounds for criminal prosecution, adverse placement decisions, or contempt actions in state court proceedings

K. Upon resolution of all related criminal matters and with proper application of Massachusetts LTC, **I respectfully request the return of my legally owned firearms or compensation for any property seized or destroyed without due process.**

L. **Order Mandating ADA-Compliant Practices by State Agencies**
Requiring DCF, courts, and foster care contractors to adopt and enforce policy changes to ensure full compliance with the Americans with Disabilities Act, including:
   1. Training for all staff interacting with children with disabilities,
   2. Individualized planning for foster placements, and
   3. Protections against retaliatory removals based on behavioral disability expression;

## 4. Removal and Disqualification of RSO John Tibbetts:

I respectfully request that John Tibbetts, the School Resource Officer (RSO) involved in the coordination and execution of law enforcement actions arising from my family's DCF-related

matters, be immediately removed and disqualified from any current or future involvement in my family's case.

Mr. Tibbetts has demonstrated a clear pattern of personal bias and professional misconduct, including (but not limited to) engaging in warrantless entry, emotionally charged and unverified reliance on statements from a minor, and repeated interference with my lawful parental authority. His continued role not only jeopardizes the neutrality of any future interactions, but actively perpetuates harm already done to the family system — particularly to the parent-child relationship between me and my son.

Most alarmingly, Mr. Tibbetts is expected to remain the active School Resource Officer at Dennis-Yarmouth High School during my son's senior year. This presents an inexcusable conflict of interest, where the same individual who helped initiate the criminal allegations against me and allegedly encouraged my son to avoid communication with his parent, now retains direct, daily access to that same child in a school setting — unsupervised, undocumented, and unaccountable.

In the event that full removal is not granted, I request at minimum that the Court issue an order:

> A. Prohibiting any unsupervised communication between Mr. Tibbetts and my son that relate in any way to the pending criminal or DCF matters.
> B. Mandating that any and all communication between Mr. Tibbetts and my son during school hours are fully documented, with written summaries made available to the family's legal counsel upon request.
> C. Initiating a third-party audit or oversight protocol for the duration of the 2025–2026 school year, to ensure that Mr. Tibbetts does not abuse his continued access to my child to shape, influence, or interfere with the facts of this case or the outcome of my son's emotional rehabilitation.

I submit that anything less would leave the door wide open for further manipulation and alienation, and would continue to erode the possibility of reunification and trust — all of which are legally protected parental interests.

## 5. Monetary Damages:

> Defendants' willful misconduct, malice, or reckless disregard of federally protected rights.

> Award compensatory damages against the above-listed DefAn award of compensatory damages in an amount to be determined at trial for the harm suffered by Plaintiff and her minor children, including but not limited to:

A. emotional distress, family separation, reputational harm, and the violation of constitutionally protected rights;

B. unique and ongoing harm to Plaintiff's daughter [Elle Woods], a nonverbal autistic child, as a result of the state's failure to accommodate her disability and the trauma caused by inappropriate removals and placements in violation of the ADA.

Plaintiff seeks this relief both in her individual capacity and, where appropriate, as temporary physical custody pursuant to the Department of Children and Families' conditional placement, pending judicial review and next friend of her minor children.

In an amount to be determined at trial, for Plaintiff's and family emotional distress, loss of parental time, reputational harm, legal costs, and forendants in their individual capacities, jointly and severally, for emotional distress, reputational harm, deprivation of parental rights, and resulting constitutional injuries.

## A. Compensatory damages for:

1. Emotional distress and reputational harm resulting from the public execution of the warrant and the appearance of wrongdoing;
2. Trauma inflicted on my minor children, especially Elle, who was subjected to the sight of her mother being handcuffed and left alone in a high chair for the duration of a warrant search;
3. Denial of access to necessary supports and services for my family due to misrepresentation and procedural gamesmanship by DCF and law enforcement;
4. Loss of employment and education opportunities or income stemming from criminal allegations and the stigma attached to pending criminal charges.

## B. Reputational Damage:

I seek damages for reputational harm caused by the dissemination of unfounded allegations by DCF and law enforcement to external parties, including medical professionals and service providers. As a direct result of state action, my authority as a parent has been unjustly questioned at my child's doctor's office and elsewhere. This has undermined my ability to participate in essential aspects of my children's lives, medical care, and education — where my legal rights had never wavered until the *su sponte* removal of my children and legal custody, pending review.

## C. Emotional Trauma and Family Separation:

I request damages for the profound and enduring trauma inflicted on my family, including my three daughters, caused by the forced separation from their brother. Christopher was a central part of our household dynamic. We had only one year remaining together before his expected college departure, and we had longstanding family goals and plans for this

29

final season together. Instead, we have experienced a sudden and complete fracture of that time — without mediation, counseling, or effort by the state to repair it.

**D. Alienation and Parental Disenfranchisement**:

The state has permitted, and in effect enabled, the complete alienation of my parental relationship with my son. Despite my continued custody rights and parental responsibilities, I have been denied access to him, denied participation in decision-making, and denied information that I am legally entitled to as his parent. This emotional harm is compounded by the state's refusal to acknowledge or correct the damage it has done.

Punitive damages to deter similar future conduct by state actors who act in bad faith or with reckless disregard for citizens' constitutional rights.

## 6. Policy-Based Remedies and Advocacy:

My case sits at the crossroads of a systemic blind spot, and I've articulated multiple failings that, if left unchecked, will continue harming families statewide. I've brought forth a set of targeted policy reform proposals, each backed by the patterns and violations in my case. It is my hopes these reforms could also be used later to support a petition to legislators or civil rights advocacy groups, to prevent similar harm to families across Massachusetts:

A formal request for the ACLU to initiate or support policy reform efforts that include:

A. Oversight over DCF's use of child testimony and hearsay in initiating investigations without corroboration;
B. Reforms to search warrant procedures involving minor children or individuals with disabilities in the home;
C. Establishing emergency standards for the treatment of nonverbal and medically vulnerable children during state interventions;
D. Advocating for clearer due process protections for parents facing simultaneous criminal and civil child welfare proceedings.

## 7. Records Correction and Retraction:

1. A full correction or sealing of any public or quasi-public records that suggest I am involved in drug trafficking, firearms trafficking, or child neglect, which have no factual basis and were rooted in unverified, retaliatory statements by my son while under DCF influence.
2. Immediate correction or removal of any documents submitted by state agents that mischaracterize my parenting, mental health, or criminal history.

## 8. Attorney's Fees and Costs:

Pursuant to *42 U.S.C. § 1988* and other applicable provisions, including for any *pro se* success or future retained counsel.

## 9. Equitable Relief:

In the interest of justice and ongoing constitutional protection, Plaintiffs also seek:

    A. Expungement or sealing of adverse state court findings or records generated through constitutionally infirm processes;
    B. Removal or permanent disqualification of named GALs, probation officers, or state agents whose misconduct materially contributed to the injuries alleged;
    C. An order affirming Plaintiff's parental standing and full restoration of all lawful rights and authority;
    D. Declaration of federal protection for Plaintiff's home surveillance system as a lawful disability accommodation under the ADA.

## 10. Request for Federal Criminal Review and Prosecution:

In addition to the civil remedies requested in the foregoing, I am formally requesting a referral to the DOJ Criminal Section of the Civil Rights Division for investigation and prosecution of criminal civil rights violations by state actors under *18 U.S.C. §§ 241* and *242*. These violations include but are not limited to:

1. Coordinated false testimony and fabrication of records by probation officers;
2. Unlawful entry and search in violation of the Fourth Amendment;
3. Removal of my disabled child without ADA-compliant accommodations;
4. Retaliatory and pretextual judicial actions used to cover constitutional misconduct.

These actions were performed under *color of state law* and constitute willful criminal deprivation of federally protected rights. I believe the weight of this matter demands criminal accountability, not only civil redress.

## 11. Any Other and Further Relief:

That this Court deems just, proper, and equitable in the interests of justice and to prevent continuing harm to Plaintiff and her family.

## 12. Proposed Policy Reform Requests:

**A. Eliminate the "He's 17, He Can Refuse" Loophole in State-Funded Care:**

**Requested Reform:**
Enact legislation or agency-level policy explicitly requiring reunification efforts and therapeutic services for youth in state care, regardless of a child's age or stated refusal, unless a judicial finding of emancipation or legal danger exists.

**Justification:**
In my case, DCF repeatedly <u>denied all contact and reunification services on the sole basis that her 17-year-old son "refused."</u>

If unchecked, this allows the state to circumvent the constitutional rights of a fit parent and strip her of meaningful access to her child(ren) during critical milestones — including his senior football season and college planning.

A child's stated refusal **should not automatically** terminate reunification services when the state holds physical custody. Families in crisis need intervention and support, not abandonment. A court must first determine whether refusal is in the child's best interests, not just defer to it blindly.

**B. Restrict School Resource Officers (RSOs) from Dual Roles in Open Family or Criminal Investigations:**

**Requested Reform:**
Prohibit School Resource Officers from participating in ongoing family court or criminal investigations involving students under their supervision without disclosure and judicial oversight.

**Justification:**
In my case, RSO John Tibbetts simultaneously acted as a mentor to the minor and a coordinator of the criminal investigation against me [the minor's parent] — while continuing to supervise that child at school. This creates an inherent conflict of interest, blurs the role of RSOs, and may lead to emotionally coercive or misleading guidance to youth without legal or parental input.

A formal separation **must** be required between law enforcement duties and educational support roles to protect due process, eliminate bias, and prevent parental alienation under the color of state authority.

**C. Require Child Welfare Protocols for Law Enforcement Serving Warrants in Homes with Disabled Children:**

**Requested Reform:**

Mandate pre-warrant planning and coordination with child protection units when executing any warrant in a household where a minor with known disabilities is present — **especially if that child is restrained or cannot self-advocate.**

**Justification:**
During the May 16, 2025 warrant execution, my nonverbal, autistic daughter was restrained in her highchair and left unattended throughout various points of time during the search of my home. Additionally, my daughter witnessed me be handcuffed and removed from her general presence/visual. No efforts were made to remove the child to safety, assign temporary care, or accommodate her unique needs – despite two different family caregivers arrived promptly to remove the vulnerable child and were denied, leaving the child in conditions described above. This violates core tenets of the ADA and basic child welfare standards. Any child left in a restricted or vulnerable state must be treated as a priority concern, and law enforcement must either involve child advocates or pause warrant execution until proper safeguards are in place.

### D. Ensure Access to a Copy of the Warrant at the Time of Service

**Requested Reform:**
Require that a physical copy of any warrant be read aloud or handed directly to the person detained or the homeowner at the time of service, and not merely left behind after the fact.

**Justification:**
In this case, I was never shown the search warrant before my handcuffing or during the execution of the warrant. It was only later discovered left behind on the couch.

This fails the standards of Mass. R. Crim. P. 3.1 and violates the principles of due process. A copy must be presented upon entry and acknowledgement secured — particularly when no prior warning or consent has been obtained.

## CLOSING AFFIRMATION:

I submit this affidavit not only as a sworn account of the extraordinary injustices my family has endured, but as a call to conscience—to the courts, to the agencies tasked with protecting our most vulnerable, and to the American people whose rights are tethered to the Constitution we all depend on.
This is more than a legal record. It is a living testament to how quickly due process can be shattered when systems turn from protectors to persecutors, and how easily justice can be replaced with retaliation.
I have withstood reputational destruction, the wrongful removal of my daughters, the betrayal of my son, and the misuse of sealed, unproven allegations to justify what should never have

been done to me or my family. But I have not broken. I have honored every court date, complied with every demand, and continued to parent under the weight of a system that has treated me not as a citizen, but as an enemy. **That is not justice.**

And so I ask this, not only on behalf of my children, but on behalf of every family who has been silenced or destroyed by unchecked power in family court, in DCF, in juvenile justice, and beyond: let this be the case that stands. Let this be *Woods v. Commonwealth*.

Let this be the moment when we say: no more sealed courtrooms where hearsay becomes law. No more unconstitutional removals. No more weaponized systems.

My pen is my sword. My truth is unshakable. My daughters deserve their home back. **And the Constitution deserves its place back in our courts.**

I have protected my children even when the state failed to do so. This is not merely a legal document—it is a sworn declaration of how one mother, one daughter, and one nation's promises collided.

I submit this in pursuit of justice, accountability, and reform.

I swear under penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

I, Kelly Patrice Woods, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 5th day of August, 2025.

Signature: _____

Name: Kelly Patrice Woods

I swear under penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

Signed under the pains and penalties of perjury this 05 day of _____08_____, 2025.

_____

Kelly Woods

4 Hawthorn St. South Dennis, Massachusetts 02660

Notarized:

Subscribed and sworn before me on this ___05___ day of ____08____, 2025.

_____

Notary Public

My Commission Expires: ___10/07/2029___

```
JOANNE M LAWSON
Commission # 50226622
Notary Public, State of New Jersey
My Commission Expires
October 7, 2029
```
Performed by means of audio-video communication with NotaryLive.com



Notarized by: Joanne M Lawson
Time: 2025-08-05 15:01:14 UTC
URL: https://notarylive.com/tu/cdp/TEJ8EA
Access ID: TEJ8EA
Pin: 57BMES